# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JANE DOE and JOHN DOE,<br>*individually, and on behalf of Baby Doe*,<br><br>Plaintiffs,<br><br>v.<br><br>EMILY JOHNSON PIPER, *in her official capacity as Commissioner of the Minnesota Department of Human Services*, LORI SWANSON, *in her official capacity as Minnesota Attorney General*, and SAMUEL MOOSE, *in his official capacity as Commissioner of Health and Human Services for the Mille Lacs Band of Ojibwe*,<br><br>Defendants. | Civil No. 15-2639 (JRT/SER)<br><br><br><br>**MEMORANDUM OPINION<br>AND ORDER ON DEFENDANTS'<br>MOTIONS TO DISMISS** |

Jeffrey S. Storms, **NEWMARK STORMS LAW OFFICE**, 100 South Fifth Street, Suite 2000, Minneapolis, MN 55402; Mark D. Fiddler, **FIDDLER LAW OFFICE, P.A.**, 6800 France Avenue South, Suite 190, Edina, MN 55435; and R. Daniel Rasmus, **HOVLAND AND RASMUS, PLLC**, 6800 France Avenue South, Suite 190, Edina, MN 55435, for plaintiffs.

Scott H. Ikeda, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, Human Services Division, Bremer Tower, Suite 1100, 445 Minnesota Street, St. Paul, MN 55101 for defendants Piper and Swanson.

Todd R. Matha, **MILLE LACS BAND OF OJIBWE**, Office Of The Solicitor General, 43408 Oodena Drive, Onamia, MN 56359, for defendant Moose.

This case is about the validity of the Minnesota Indian Family Preservation Act ("MIFPA"), a law enacted by the Minnesota State Legislature for the purpose of addressing historic wrongs to American Indian ("Indian") tribes and families. Plaintiffs Jane and John Doe are themselves Indian, but they view the statute as an infringement on their rights to equal protection and due process. The Does are not the first to challenge a statute like this one, but their complaint is unique because they have decided to challenge only MIFPA's notice and intervention provisions and not its preference provisions, which were the subject of a recent Supreme Court case decided on other grounds. *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013). Defendants now move to dismiss the complaint either for lack of jurisdiction or failure to state a claim.

The Court finds that it has jurisdiction to hear the Does' complaint, but only against the government defendants. The Court will dismiss Commissioner Moose from the case because he is a tribal officer and not a state officer; does not enforce MIFPA; and is not restricted by the constitutional clauses at issue here. But even though the Court may proceed to the merits of the Does' complaint against the government defendants, the Court will not decide the merits now. The parties necessarily and understandably devoted nearly all of the briefs to the numerous preliminary issues. Although the jurisdictional questions were well briefed, the Does' equal protection and due process claims received less attention than they deserved. Accordingly, in deciding these motions the Court will express no opinion on the merits – only on the preliminary matters. It may be that Defendants' positions on the merits are correct – or incorrect – but those questions will be decided another day.

## BACKGROUND

### I.     MIFPA

In the mid-1970s the nation experienced "rising concern . . . over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Adoptive Couple*, 133 S. Ct. at 2557 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)).  Congress as a result passed the Indian Child Welfare Act of 1978 ("ICWA") after finding "that an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies."  25 U.S.C. § 1901(4).

ICWA, in short, creates procedures for Indian tribes to push state courts to place Indian children with Indian families when those children are put up for adoption.  ICWA accomplishes this goal through a "preferences" provision:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

*Id.* § 1915(a).  But crucially, the relevant ICWA provisions apply only to **involuntary** adoption proceedings where the parent or parents are not choosing to give their child up for adoption.  *See id.* § 1912(a) ("In any involuntary proceeding . . . ."); *Adoptive Couple*, 133 S. Ct. at 2557 (discussing ICWA's governance of "involuntary termination of parental rights").  These provisions do not apply in **voluntary** proceedings.

After Congress passed ICWA, the Minnesota State Legislature followed the federal government's lead and in 1985 passed MIFPA, a state-law ICWA analogue with a broader reach.  MIFPA expanded on ICWA's principles to regulate not only involuntary proceedings but also voluntary proceedings.  Minn. Stat. § 260.761, subdiv. 3 ("In any voluntary adoptive . . . proceeding . . .").

Only a few of MIFPA's provisions are relevant here, the first being the statute's notice requirement.   MIFPA requires that certain parties provide relevant Indian tribes with notice of a MIFPA-applicable adoption proceeding:

> In any voluntary adoptive or preadoptive placement proceeding in which a local social services agency, private child-placing agency, petitioner in the adoption, or any other party has reason to believe that a child who is the subject of an adoptive or preadoptive placement proceeding is or may be an "Indian Child," . . . the agency or person shall notify the Indian child's tribal social services agency by registered mail with return receipt requested of the pending proceeding and of the right of intervention under subdivision 6.

*Id.*

Once armed with notice of an adoption, MIFPA's intervention provision becomes relevant:  "In any state court proceeding for the voluntary adoptive or preadoptvie placement of an Indian child, the Indian child's tribe shall have a right to intervene at any point in the proceeding." *Id.*, subdiv. 6.

Intervention is significant because if a tribe utilizes its right to intervene, it may petition the state court to transfer the case to "the jurisdiction of the tribe," and the court must grant the petition absent findings of "good cause" unrelated to "[s]ocioeconomic conditions" or "the perceived adequacy of tribal . . . social services or judicial systems."

Minn. Stat. § 260.771, subdiv. 3(a), 3a(a).   If the case is transferred to the tribe, the tribe's decision on placement is binding.  *Id.*, subdiv. 4.

Alternatively, even if the state court does not transfer the case, a tribe that intervenes may offer an alternative out-of-home placement plan, *id.* § 260.762, subdiv. 2, and the state court then must generally follow ICWA's preferences in deciding where to place the child, *id.* § 260.771, subdiv. 7; *see* 25 U.S.C. § 1915.

## II.   FACTUAL BACKGROUND

Baby Doe was born in Minneapolis, Minnesota, in April 2015 to biological parents Jane and John Doe.  The Does have been a couple since 2003, are unmarried, and live together.  They have borne other children together that they are currently raising.  Jane is enrolled in the Mille Lacs Band of Ojibwe ("Mille Lacs Band" or "the Band") but does not keep her domicile or residence on the Mille Lacs Band or any other Indian tribe's reservation.  John is also enrolled in an Indian tribe, although his tribe is not named in the complaint.  Like Jane, John does not domicile or reside on an Indian reservation.  The Does kept Jane's pregnancy and Baby Doe's birth secret from the Mille Lacs Band.

For reasons not described in detail in the complaint, the Does decided that they would voluntarily give Baby Doe up for adoption and relinquish their parental rights.  The Does state this decision was "difficult" but in Baby Doe's best interests.  (Verified Compl. for Decl. and Inj. Relief ("Compl.") ¶¶ 30, 36, June 3, 2015, Docket No. 1.)

To facilitate Baby Doe's adoption, the Does engaged a private agency that would allow the Does to choose the couple that would become Baby Doe's adoptive parents.

The couple the Does selected ("Adoptive Parents") are parents to a boy older than Baby Doe and are "good people" and "excellent parents" in the eyes of the Does.  (*Id.* ¶ 34.)

Neither of Adoptive Parents is of Indian descent, and neither is enrolled in a federally recognized Indian tribe.  The Does and Adoptive Parents have agreed that after the adoption the couples will "share pictures, text each other, and meet with Baby Doe from time to time."  (*Id.* ¶ 35.)  The couples have also agreed that Adoptive Parents will ensure Baby Doe learns about Indian culture and history.

## III.   PROCEDURAL BACKGROUND

On May 8, 2015, a Hennepin County district judge entered an ex parte pre-adoptive custody order, granting Adoptive Parents custody over Baby Doe while adoption proceedings were ongoing, subject to the Does' continuing right to custody. The judge's order included findings of fact indicating that the Does supported the adoption and the placement of Baby Doe with Adoptive Parents.  (Aff. of Dan Rasmus, Ex. A. at 1-2, June 5, 2015, Docket No. 10.)  The Does had 60 days from the date of the state court custody order – until July 8, 2015 – to provide the state court with formal consent to Baby Doe's adoption.  (Compl. ¶ 41.)  And before the Does provided the state court with their consent, MIFPA required that they first give notice of the state court proceeding to the Mille Lacs Band, because Baby Doe was eligible for enrollment in the tribe.  *See* Minn. Stat. § 260.761, subdiv. 3 (requiring notice while "[i]n" the adoption proceeding).

On June 3, 2015, the Does filed a complaint in this Court naming as defendants Samuel Moose, the Commissioner of the Mille Lacs Band's Department of Health and Human Services; Lori Swanson, Minnesota's Attorney General; and then-Commissioner of Human Services Lucinda Jesson[1] (together "Defendants").  The complaint alleged that MIFPA's notice and intervention requirements violated the Fourteenth Amendment to the United States Constitution, either facially or as applied to the Does and/or Baby Doe. (Compl. ¶ 2.)   The complaint also alleged that the Does were likely to endure four injuries, absent prospective relief:

> (i) a breach of privacy, because if either the Does, their adoption agency, or another party provided notice to the Mille Lacs Band, the Does' private information could be compromised either through the notice itself or via subsequent discovery requests following the Band's intervention into the state court adoption proceeding (*id.* ¶¶ 37-38);

> (ii) the compromise of the Does' adoption plans, because if the Band is provided with MIFPA notice and then intervenes in the state court adoption proceeding, the state court's subsequent possible application of MIFPA's preference provisions may require the Does either to allow Baby Doe to be adopted by someone other than Adoptive Parents, or to abandon their plans for adoption altogether (*see id.* ¶¶ 39-40 (stating that the Does would rather keep Baby Doe than allow Baby Doe to be adopted by a couple other than Adoptive Couple));

> (iii) a denial of fundamental rights of privacy and parenting as protected by the Fourteenth Amendment's Due Process Clause, for the same reasons as stated above:   the application of MIFPA's notice and intervention provisions may result in Baby Doe being raised either by the Does or a couple other than Adoptive Parents, even though the Does believe Baby

---

[1]   In December 2015, Minnesota Governor Mark Dayton announced that he was appointing Jesson to the Minnesota Court of Appeals.  Jesson vacated her office at the Department of Human Resources, and Dayton filled the vacancy with current-defendant Emily Johnson Piper.  Pursuant to Federal Rule of Civil Procedure 25(d), Piper was automatically substituted for Jesson as the party to this action.  (Letter to the Court, Dec. 14, 2015, Docket No. 51.)

Doe's best interests require that the child be raised by Adoptive Parents (*id.* ¶¶ 45-49); and

(iv) a denial of the right to equal protection as protected by the Fourteenth Amendment's Equal Protection Clause:  MIFPA's notice and intervention provisions only apply to Baby Doe's adoption proceeding because of Jane and John Does' Indian heritage, and MIFPA would not require notice, and the Mille Lacs Band could not intervene, if the Does were a similarly situated non-Indian family (*id.* ¶¶ 55-58).

Two days after the Does filed their complaint – and a little over one month before MIFPA required them to provide notice to the Mille Lacs Band – the Does filed a Motion for Preliminary Injunctive Relief with this Court, requesting that the Court preliminarily enjoin Defendants from enforcing or implementing the notice and intervention provisions of MIFPA.  The Does argued that they faced two likely irreparable harms – the disclosure of their identities to the Mille Lacs Band, and the possible intervention of the Band into their adoption proceeding.  (Mem. in Supp. of Pls.' Mot. for Prelim. Inj. Relief at 1, June 5, 2015, Docket No. 9.)   The Does did not base their preliminary injunction argument on their anticipated injuries to their fundamental right to parenting and equal protection.  (*Id.*)

After the Does filed their preliminary injunction motion, but before this Court had ruled on it, Defendants filed two separate motions to dismiss, one bought by Moose and another bought by Swanson and Jesson.  Moose attached an exhibit to his motion to dismiss labeled "Covenant Not to Intervene."  (Moose Ex., June 25, 2015, Docket No. 26.)  Moose stated in the exhibit that he would not intervene in the Does' adoption proceeding.  (*Id.*)

On July 2, 2015, the Court denied the Does' preliminary injunction motion because the Does' anticipated irreparable harms were not "likely" to occur under the preliminary injunction standard, even though they were irreparable. (Mem. Op. and Order at 10, July 2, 2015, Docket No. 42.) The Does' identities were not likely to be disclosed either through (1) the providing of MIFPA notice to the Band, because MIFPA allows the Does to give notice to a tribe in an anonymous fashion (*id.* at 8 (citing Minn. Stat. § 260.761, subdiv. 3)); or (2) state court discovery orders because Minnesota's rules of civil procedure allow a state court to fashion protective orders (*id.* at 8-9). The Court also found that Moose's promise not to intervene made it less than likely that he would. (*Id.* at 9-10.)

After the Does lost their motion for a preliminary injunction, they provided Mille Lacs with the required MIFPA notice on July 6, 2015. (Aff. of Mark D. Fiddler ("Fiddler Aff."), Ex. 1 ("MIFPA Notice"), July 16, 2015, Docket No. 44.) The notice did not contain the true names of Jane and John Doe, but it may have contained Baby Doe's. (*See id.* at 1 (redacting the name of the child).) In response to the notice, the Mille Lacs Band's Solicitor General Todd Matha wrote the Does a letter stating that the Does had permission to "file the Covenant Not to Intervene" in their state adoption proceeding. (*Id.*, Ex. 2 ("Moose Covenant").) The following day the Does recorded their formal consent to the adoption and filed with the state court copies of Matha's notice-response and the Moose Covenant. (Fiddler Aff. ¶¶ 4, 5.) The state court's final adoption hearing was expected to take place in mid-August 2015. (*Id.* ¶ 6.) At no point did the Band intervene in the proceeding.

**ANALYSIS**

## I.    STANDARD OF REVIEW

Defendants move to dismiss the Does' complaint under Federal Rules of Civil Procedure 12(b)(1) and (6).  "A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction and requires the Court to examine whether it has authority to decide the claims."  *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1063 (D. Minn. 2013).  In deciding a motion under Rule 12(b)(1), the Court must first "distinguish between a 'facial attack' and a 'factual attack.'"  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction."  *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  In other words, in a facial challenge, the court "determine[s] whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint, and drawing all reasonable inferences in favor of the plaintiff."  *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005) (citations omitted).  In a factual attack, the court "inquires into and resolves factual disputes," *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 801 (8th Cir. 2002), and is free to "consider[] matters outside the pleadings," *Osborn*, 918 F.2d at 729 n.6. The nonmoving party in a factual challenge "does not have the benefit of 12(b)(6) safeguards."  *Id.*

In reviewing a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *See, e.g.*, *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"   *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.*   Rule 12(b)(6) also authorizes the Court to dismiss a claim on the basis of a dispositive legal issue. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

## II.   JURISDICTIONAL AND PRUDENTIAL ISSUES

### A.   Standing:  The Does' Alleged Injuries[2]

Defendants argue that the Does' alleged injuries are too speculative to satisfy Article III's strictures.  Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  *Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1146 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  "'To qualify as a party with standing to litigate,' [a party] 'must show, first and foremost,' injury in the form of 'invasion of a legally protected interest that is concrete and particularized and actual or imminent.'"  *Ariz. State. Legis. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015)  (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)).  The "injury also must be 'fairly traceable to the challenged action' and 'redressable by a favorable ruling.'  *Id.* (quoting *Clapper*, 133 S. Ct. at 1147).  Courts including the Eighth Circuit have labeled these elements of standing as (i) "injury," (ii) "causation," and (iii) "redressability."  *See Hammer v. Sam's East, Inc.*, 754 F.3d 492, 497 (8th Cir. 2014) (quoting *Lance v. Coffman*, 549 U.S. 437, 438 (2007)).

---

[2] Whether the Does' complaint should be dismissed because the Does provided the required MIFPA notice and the Band promised not to intervene in the state court proceeding, and thus because there is arguably nothing left to enjoin, is a question of mootness, not standing.  *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (reversing court of appeals for confusing standing for mootness).  The Court will address Defendants' mootness arguments below, in Analysis Part II.E.

To satisfy the injury element of standing when a plaintiff seeks prospective relief for an injury that has yet to occur, the plaintiff must show that he is "imminently threatened." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). The "threatened injury must be certainly impending." *Clapper*, 133 S. Ct. at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). When determining whether a plaintiff's alleged injury is sufficiently imminent, the Court looks to the facts at the time the complaint was filed and may not consider subsequent developments. *Davis v. FEC*, 554 U.S. 724, 733-35 (2008).

Here, the Does allege four injuries that had yet to occur as of the date the complaint was filed. These four injuries were contingent on the happening of two events that had also not yet occurred as of the filing of the complaint: the Does giving notice of Baby Doe's adoption to the Mille Lacs Band, as required by MIFPA, and the Band's exercise of its right under MIFPA to intervene into the adoption proceeding. Complying with the notice requirement would cause the Does' alleged breach-of-privacy and equal-protection injuries, and the Band's intervention would cause the adoption-compromise and fundamental-right-to-parenting injuries.[3]

Defendants argue the Does lack standing because neither of these events had occurred and the corresponding injuries were not imminent as of the date of the

---

[3] Defendants do not argue that the Does' alleged equal protection and due process injuries are on their own insufficient to create Article III standing, but the Supreme Court held otherwise. *Heckler v. Mathews*, 465 U.S. 728, 738-39 (1984) (collecting cases and stating that "unequal treatment" is an Article III injury).

complaint.[4]  The Court, however, rejects this argument.  With regard to the provision of

MIFPA notice, the Supreme Court has held that an injury is imminent when the

contingency that prevents the injury's occurrence is the plaintiff's own hesitance to

commit the act that gives rise to the injury.  *Steffel v. Thompson*, 415 U.S. 452, 459

(1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or

prosecution to be entitled to challenge a statute that he claims deters the exercise of his

constitutional rights.").  The imminent-injury requirement does not mandate a plaintiff to

"destroy a large building" or "bet the farm" before litigating his or her concerns.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 134 (2007).  The Does' notice-related

injuries, as pleaded in their complaint, fall squarely within this category:  the only thing

that prevented the Does from providing MIFPA notice was their own hesitance to suffer

the equal protection injury they hoped to avoid.  The Does need not comply with the very

law they believe illegal before receiving the chance to adjudicate their claims in federal

court.  The notice-related injuries are therefore imminent.

The same is true for the intervention-related injuries, but for a slightly different

reason.  Those injuries are premised on a different type of contingency:  the decision of a

---

[4] Defendants offer several arguments that the injuries are too speculative.  Jesson and Swanson state that as of the date of the complaint they had not threatened the enforcement of MIFPA against the Does.  (State Defs.' Reply in Supp. of Mot. to Dismiss at 4, July 30, 2015, Docket No. 45.)  Moose states that as of the date of the complaint he had given no intention that he would intervene in the state court adoption proceeding, and that he had not received any of the Does' private information.  (*See* Moose's Mem. of Law in Supp. of Mot. to Dismiss at 10-15, July 25, 2015, Docket No. 25.)  Moose also reiterates that the Does could possibly avoid any breach of their privacy through statutory and procedural privacy protections.  (*Id.*)  And all defendants argue that the state court may very well approve the adoption even if the Does refused to provide a tribe with MIFPA notice.  (State Defs.' Mem. in Supp. of Mot. to Dismiss at 5, June 25, 2015, Docket No. 32.)

third party.  Specifically, it is the Band, not the Does, who has the power to decide whether to intervene and cause the alleged harms.   In similar cases the Supreme Court has held that injury is imminent where the contingency that prevents the occurrence of a future injury is a third-party's decision to exercise – or not exercise – a right conferred by the allegedly unconstitutional law.   For example, in the 2008 case *Davis v. FEC*, the wealthy congressional candidate-plaintiff Jack Davis sought declaratory and injunctive relief from the McCain-Feingold Act's "Millionaire's Amendment," which would have allowed Davis's opponent to access heightened campaign contribution limits.  554 U.S. at 733-35.  But at the time of Davis's complaint, Davis's opponent had not yet filed the necessary paperwork to access the higher limits.  *Id.*  Nonetheless, and in spite of the possibility that the opponent may never file the paperwork, the Court held that Davis's anticipated injury was sufficiently "real, immediate, and direct" because "there was no indication that his opponent would forgo" the heightened limits.  *Id.* at 734.[5]  (Davis's opponent wound up not filing the paperwork, with no effect on Davis's standing.  *Id.*)

In this case, the Mille Lacs Band's right to intervention is akin to the *Davis* opponent's right to heightened contribution limits.   At the time the Does filed their complaint, there was no indication the Band would forgo their right to intervention.

---

[5] *See also Pennell v. City of San Jose*, 485 U.S. 1, 4-9 (1988) (holding that a group of landlords had standing to challenge a rent-control ordinance, even though the landlord's alleged future injury was premised on (i) a landlord increasing rent over eight percent, (ii) a tenant objecting to that increase, and (iii) a finding by the hearing officer that the increase was unreasonable); *Blum v. Yaretsky*, 457 U.S. 991, 999-1001 (1982) (holding that nursing-home residents had standing to challenge a federal regulation permitting their nursing home to transfer them to an allegedly less desirable home even though their nursing home had not yet threatened to transfer the plaintiffs).

(Moose did not make his promise to not intervene until after the Does had filed their action against him.)  The injuries related to the intervention were therefore imminent.

It also worth noting that none of the Does' alleged injuries depend on the great number of contingencies that existed in cases in which the Supreme Court has found that litigants failed to plead an imminent injury.  *See, e.g.*, *Clapper*, 133 S. Ct. at 1148 (holding that plaintiffs lack standing where five less-than-likely events would have had to occur before plaintiffs would have suffered an injury); *Whitmore*, 495 U.S. at 156-61 (holding that plaintiff lacked standing where he would not have suffered an injury until he pursued habeas corpus relief, received habeas corpus relief, received a new trial, and was re-prosecuted and reconvicted).  And neither are the Does' alleged injuries too temporally distant:  their injuries were certain to occur, if at all, before the end of the adoption proceeding (approximately two months from the filing of the complaint).  *Cf. McConnell v. FEC*, 540 U.S. 93, 225-26 (2003) (holding injury that would not occur for five years was not imminent); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (holding injury that would occur "[n]ot next year" but "some day" in the future was not imminent).

The Court therefore finds that the Does complaint may not be dismissed for failure to meet the injury element of the standing requirement.

## B.    The Proper Defendants

Defendants next argue the Does named the wrong individuals as defendants.  A federal court may not hear a complaint against a government official if the official is

unconnected to the enforcement of the complained-of law. *Digital Recognition Network, Inc. v. Hutchison*, 803 F.3d 953, 957-58 (8th Cir. 2015); *cf.* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1210 (2010) ("The fundamental question . . . is the who question:  who has violated the Constitution?").

This requirement – that a government defendant must be connected to the enforcement of the relevant law – has multiple doctrinal roots.  First, the standing doctrine's causation element requires that "when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, . . . the named defendants [must] possess authority to enforce the complained-of provision," because a plaintiff's alleged injury must be "fairly traceable" to the official sued.  *Digital Recognition*, 803 F.3d at 957-58 (first quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007); then quoting *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997)).  Similarly, the standing doctrine's "redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute" because in that scenario it is not possible for a court to grant a remedy that would redress the plaintiff's complained-of injury.  *Id.* at 958 (quoting *Bronson*, 500 F.3d at 1111).

Finally, sovereign immunity requires a plaintiff to name an official with a connection to enforcement of the at-issue provision because the plaintiff's complaint would otherwise be against the state.  Principles of sovereign immunity, formally recognized and protected by the Eleventh Amendment, bar a federal court from hearing cases "commenced or prosecuted against one of the United States."  U.S. Const. amend. XI; *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).  This prohibition bars not only actions

against states *per se*, but also actions against state officers where "the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)); *see also Digital Recognition*, 803 F.3d at 960 (barring courts from hearing claims where the plaintiff names an official "in an impermissible attempt to 'make the state a party'" (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

Courts differentiate permissible from impermissible actions against government officers by determining whether the officer has "**some connection** with the enforcement of the act." *Ex parte Young*, 209 U.S. at 155-60 (emphasis added).   An officer's connection to the enforcement of an act may "arise[] out of the general law" or be "specially created by the act itself." *Id.* at 157.  But if the officer lacks some connection to the enforcement of act, then standing doctrine and sovereign immunity bar the court from hearing the plaintiff's claim.  *Digital Recognition*, 803 F.3d at 957.

The Court will separately consider each Defendant's connection to the enforcement of MIFPA's notice and intervention provisions.

### 1.    Government Defendants

According to the Does, Piper and Swanson are both connected to the enforcement of MIFPA's notice provision by Minnesota Statute § 259.45, subdivision 2.  That section states in pertinent part:

> The attorney general or the commissioner [of the Department of Human Services] may bring an action in district court if the directors or those in control of [an adoption] agency have misapplied or wasted assets of the agency or have acted fraudulently, illegally, or in a manner unfairly

> prejudicial toward a client of the agency in the capacity of a director or one
> in control of the agency.

Minn. Stat. § 259.45, subdiv. 2.  Under this section, either Piper or Swanson could bring an action against an agency director who failed to provide the required MIFPA notice, because failing to do so would be "act[ing] . . . illegally" in § 259.45, subdivision 2's terms.  The Court finds that this statutory section grants Piper and Swanson a sufficient connection to the enforcement of MIFPA's notice provision.

The Does also argue that Minnesota Statute § 245A.07, subdivision 3, grants Piper another connection to the enforcement of the MIFPA notice provision.  That section authorizes the commissioner of the Department of Human Services to "impose a fine" on a "license holder" if the "license holder fails to comply fully with applicable laws or rules."  Minn. Stat. § 245A.07, subdiv. 3.  Minnesota's definition of "license holder" includes any person or entity licensed to assist with adoption placements and proceedings.  *See* Minn. Stat. §§ 245A.02, subdiv. 9 (defining license holder), 245.03, subdiv. 1(2), (3) (stating those who "help plan" adoptions must be licensed).  The Does argue that because MIFPA requires an adoption agency to provide MIFPA notice if the agency has knowledge of an Indian child's adoption proceeding (as MIFPA requires of all parties with knowledge of the proceeding), then § 245A.07 grants Piper, as commissioner, the ability to impose a fine on a licensed adoption agency that fails to provide MIFPA notice.  This, the Does argue, grants Piper a sufficient connection to the enforcement of MIFPA's notice provision above and beyond the connection in § 259.45,

described above.  The Court agrees and finds that both Piper and Swanson are proper defendants.

Piper and Swanson make several arguments that are ultimately unavailing but must be discussed.  First, Piper and Swanson argue §§ 245A.27 and 259.45 cannot grant them "some connection" to the enforcement of MIFPA's notice provision because these statutory sections are located outside MIFPA, in other areas of the Minnesota code.  This argument fails, however, because as the Supreme Court explicitly stated in *Ex parte Young*, and the Eighth Circuit has recently restated in *Digital Recognition Network*, an official can be enjoined even from using powers granted to her by the "general law," not just authority granted by the specific statutory section in question.  *Digital Recognition*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).  In other words, Piper and Swanson may be enjoined from using their respective authorities under §§ 259.45 and 245A.07 to enforce MIFPA as long as such an injunction would redress the Does' injury or injuries; it does not matter that the sections are in a different section of the code.

Piper and Swanson also correctly note that a court may not enjoin an official from enforcing a law to which she has no connection just because the official possesses authority under a separate law to punish related conduct.  For example, in *Digital Recognition Network*, the plaintiffs requested prospective relief to prohibit Arkansas's attorney general from enforcing a license plate privacy law.  803 F.3d at 955-56.  The plaintiffs argued in part that because the attorney general had power under a different law to file nuisance enforcement actions, and the license plate law prohibited conduct that might also be considered a nuisance, then the attorney general necessarily had a

connection to the enforcement of the license plate law.  *Id.* at 963.  The Eighth Circuit disagreed, however, holding that an official does not have the power to enforce statute A just because he has the power under statute B to enforce conduct prohibited by both statutes.  *Id.*  Here, however, the Court is asked to evaluate a law different than that at issue in *Digital Recognition Network*.  Piper and Swanson's respective authority under §§ 259.45 and 245A.07 grants them the power to pursue remedies for actual violations of MIFPA, not for conduct that is overlappingly outlawed by MIFPA and some other law.

Piper and Swanson also argue that even if they have "some connection" to the enforcement of MIFPA's notice provision, they lack the authority to enforce the provision specifically against the Does.  The Court interprets this argument as a causation and redressability argument:  if Piper or Swanson were to pursue enforcement actions against the Does' adoption agency, the Does would not suffer injury; and if the Court were to enjoin Piper and Swanson from seeking enforcement actions against adoption agencies, that remedy would not redress the Does' imminent injuries.  But this argument fails too, because although the Does' injury is only indirectly caused by Piper and Swanson's ability to enforce the law against an adoption agency, "indirectness is 'not necessarily fatal to standing.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976)).  Piper and Swanson's ability to enforce MIFPA's notice provisions against an adoption agency made it much more likely that the Does' adoption agency might notify the Mille Lacs Band of Baby Doe's adoption proceeding, in turn increasing the likelihood of the Band's intervention.  Put another way, prospective relief against Piper and Swanson as of the

date the complaint was filed would have made it less likely that the Does' anticipated injuries would come to pass.

Finally, the Court finds that Piper and Swanson's enforcement powers under §§ 259.45 and 245A.07 grant them some connection to the enforcement of not only MIFPA's notice provision, but its intervention provision as well.  Although Piper and Swanson do not possess the authority to directly enforce the intervention provision, a tribe can only exercise its right to intervene if it is given notice of the cases to which intervention is possible.  Thus, if Piper and Swanson did not enforce the notice provision, it would be far less likely that a tribe would intervene in an adoption proceeding.  While this connection to the enforcement of the intervention provision may not be explicit or direct, it is at least "some connection."  *Ex parte Young*, 209 U.S. at 155-60; *cf. Bennett*, 520 U.S. at 168-69 ("While . . . it does not suffice if the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court,' . . . that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (citation omitted) (quoting *Lujan*, 504 U.S. at 560-61)).

For these reasons, the Court concludes that both Piper and Swanson are proper defendants.

### 2.  Moose

The Does argue that Moose, like Piper and Swanson, is a proper defendant because MIFPA grants him the right to receive notice of and to intervene in a relevant Minnesota state court adoption proceeding.  This argument cannot succeed, however, for

several reasons.  First, MIFPA does not grant Moose powers of enforcement, it merely grants him rights.  The notice provision designates Moose's Department, as the Mille Lacs Band's "[t]ribal social services agency," as the entity to which MIFPA notice must be sent.   Minn. Stat. §§ 260.755, subdiv. 21 (defining "Tribal social services agency"), 260.761, subdiv. 3 ("[T]he agency . . . shall notify the Indian child's tribal social services agency . . . .").  Moose's role as notice recipient is only that of a recipient: it is entirely passive.  Perhaps the Court could enjoin a government officer from requiring a party to send notice, but the Court will not enjoin a recipient from receiving it.

The Does also note that MIFPA grants the Mille Lacs Band a right to intervene in relevant state court adoption proceedings.  Minn. Stat. § 260.761, subdiv. 6.  But even if a right to intervene is a power of enforcement, Minnesota law does not designate Moose as the intervening official, and Mille Lacs Band law explicitly states that right belongs to someone else – the Band's "Solicitor General or selected representative."  Mille Lacs Band Stat. Ann. tit. 8, §§ 5(f)(2), 3116(b)(4)(B).

Alternatively, even if either of these provisions gave Moose a more active role in MIFPA adoptions proceedings, Moose cannot be kept in this case as a defendant because he is a **tribal** officer, not an officer with Minnesota's government.  He necessarily lacks a role in enforcing Minnesota law.  The history of United States-Indian tribe relations is long and difficult, but the federal government has always maintained that tribes and their governments are "separate sovereigns." *Michigan v. Bay Mills Indian Comty.*, 134 S. Ct. 2024, 2030 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).  In fact, the federal government has recognized the Mille Lacs Band's sovereignty longer

than it has Minnesota's:  The United States negotiated treaties with the Ojibwe and the Mille Lacs Band long before Minnesota was admitted as a State.  *Compare* Treaty with the Wyandot, 7 Stat. 18 (Jan. 21, 1785) (signed by a "Chippewa" designee in 1785), *and* Treaty with the Chippewa, June 15, 1837, 7 Stat. 537 (signed by two "[c]hiefs" of the "Mille Lac" in 1837), *with* Act of May 11, 1858, 11 Stat. 285 (admitting the State of Minnesota to the Union in 1858).  Thus, just as South Dakota's officers are not responsible for the enforcement of North Dakota's law, neither are Mille Lacs officers responsible for enforcing Minnesota law's.[6]

Not only is there no general duty for a tribal government to enforce a state government's laws, but our federal system in many instances even prohibits tribal government officers from enforcing state and federal laws.  *See Nevada v. Hicks*, 533 U.S. 353, 366-69 (2001) (holding that tribal courts may lack jurisdiction to enforce 42 U.S.C. § 1983); *cf. Miller v. United States*, 357 U.S. 301, 305, 305 n.4 (1958) (noting a state officer's enforcement of federal law is unlawful absent state or federal law permitting enforcement); *United States v. Di Re*, 332 U.S. 581, 589-90 (1948) (same).

Finally, Moose is not a proper defendant in this case because his actions as a tribal officer are not constrained by the Fourteenth Amendment.  The Does request that the Court enjoin Moose from using purported MIFPA-enforcement powers that allegedly violate the Fourteenth Amendment's Equal Protection and Due Process Clauses.  But by

---

[6] Federal officials may compel one state's officials to enforce another state's law when specifically permitted by the Constitution, *see, e.g.*, U.S. Const. art. IV, § 1 (Full Faith and Credit Clause), but the general rule is that no sovereign may compel enforcement of their law on another sovereign's officers, *see Printz v. United States*, 521 U.S. 898, 917 (1997).

their terms, the Equal Protection and Due Process Clauses apply only to the actions of states, not tribal governments.  U.S. Const. amend. XIV, § 1 ("nor shall any **state** . . ." (emphasis added)).  These clauses "do[] not apply to restrict the actions of Indian tribes." *United States v. Cavanaugh*, 643 F.3d 592, 595 (8th Cir. 2011) (citing *Santa Clara Pueblo*, 436 U.S. at 56).  This premise is "one of the most basic tenets of American constitutional law." *Twin Cities Chippewa Tribal Council v. Minn. Chippewa Tribe*, 370 F.2d 529, 533 (8th Cir. 1967); *see also Talton v. Mayes*, 163 U.S. 376, 384 (1896) (holding that the Fifth Amendment does not "operat[e] upon" the Indian tribes).  The Court accordingly may not award the Does an injunction against Moose for alleged Fourteenth Amendment violations that he cannot possibly commit.

Whether based on Article III, sovereign immunity, or state action doctrine, the Court's conclusion is the same:  Moose is not a proper defendant, and the Court will grant his motion to dismiss.

## C.      Third-Party Standing

Defendants next argue that even if the Does possess Article III standing in their own right, they are improperly seeking to litigate the injuries of a third party – their adoption agency.  Closely related to the constitutional requirement that a plaintiff must suffer a personal injury to have standing is the prudential requirement that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499

(1975); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (restating the rule).

Here, Defendants argue that because Piper and Swanson's enforcement powers are only against adoption agencies and not the Does directly, the Does are necessarily seeking to litigate their adoption agency's interests. But just as an indirect injury does not destroy Article III standing, neither does it indicate that a party is resting his or her claim on the interests of others. The Does are litigating their own interests, not their adoption agency's.

Yet even if the Does were seeking to litigate their adoption agency's interests, the Does would still have standing. "Third-party standing" is a doctrinal exception to this prudential bar on raising another's interests in litigation: a plaintiff may litigate the interests of a third party where (i) the plaintiff has Article III standing in his or her own right, (ii) the plaintiff has a "close relation to the third party," and (iii) there is "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1975); *see also Au-Aulaqui v. Obama*, 727 F. Supp. 2d 1, 23-24 (D.D.C. 2010) (declining to grant plaintiff third-party standing).

The Does meet all of these elements. As discussed in Parts II.A and B of the Analysis section, the Does have standing in their own right and therefore meet the first element. On the second element, courts have held that a "close relation" exists where, as here, the plaintiff has a professional relationship with the party whose interests he or she seeks to litigate. *See, e.g.*, *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715 (1990) (holding that an attorney-client relationship is sufficient); *Craig v. Boren*, 429 U.S. 190 (1976)

(beer vendor-underage customer relationship); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (Planned Parenthood official and physician's relationships' with contraceptive users).   And finally, the Does meet the third element because a sufficient "hindrance" exists when the third party's claims are likely to soon become moot. *Craig*, 429 U.S. at 192. Such is the case here because the Does' adoption agent's claims would presumably also be moot after the Band received notice and the state court ended the adoption proceeding.

### D.      *Younger* Abstention

Defendants next argue that *Younger* abstention requires the Court to refrain from deciding the Does' case. "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Comm'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013). However, principles of comity and equity call for exceptions to this general rule in certain specific instances.  One exception is *Younger* abstention, which requires a court to refrain from deciding three "exceptional" categories of cases where plaintiffs ask a federal court to enjoin ongoing state court (i) criminal proceedings; (ii) civil enforcement actions "that are akin to a criminal prosecution" and typically initiated by the state in its capacity as sovereign; and (iii) civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* (citing *Younger v. Harris*, 401 U.S. 37 (1971)).   The Supreme Court "ha[s] not applied *Younger* outside these three 'exceptional' categories," and has explicitly held "that they **define** *Younger*'s scope." *Id.* at 591 (emphasis added).

- 27 -

Here, Baby Doe's state court adoption proceeding was undeniably not a criminal prosecution, civil enforcement proceeding "akin to a criminal prosecution," nor a civil proceeding involving the enforcement of a state court judgment.

Defendants argue that the Court should expand on these limited categories, but the Supreme Court explicitly foreclosed such a possibility in the 2013 case *Sprint Communications v. Jacobs*. Prior to *Sprint*, a number of courts, including the courts in this circuit, applied *Younger* abstention in a broader fashion. But those days are over. The Eighth Circuit's old approach inappropriately "required a plaintiff to exhaust state remedies before proceeding to federal court" by requiring federal courts to decline jurisdiction whenever the ongoing state proceeding "implicate[d] important state interests" and provided an "adequate opportunity to raise federal challenges" – a test that was easily met. *Id.* at 589. The Eighth Circuit has acknowledged that *Sprint* rejected its old broader approach. *Banks v. Slay*, 789 F.3d 919, 923 (8th Cir. 2015) (listing the three "exceptional" categories where *Younger* abstention applies); *Johnson v. Weber*, 549 F. App'x 597, 598 (8th Cir. 2014) (stating that *Sprint* "clarif[ied the] limited applicability of *Younger* abstention).

Therefore, *Younger* abstention does not apply.[7]

---

[7] Two additional observations counsel against the application of *Younger* abstention: First, it is unclear whether the Does have even requested that the Court enjoin the state court adoption. Second, it is highly unlikely the adoption proceeding remains ongoing as of the date of this order, although the Court has not been made aware of the proceeding's status, possibly eliminating the reason for abstention if abstention were otherwise necessary.

### E.     Mootness

Finally, Defendants argue the Does' claims are moot.  Mootness doctrine, like standing doctrine, derives from Article III's case-or-controversy requirement.  *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013).  "The 'case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.'"  *Id.* (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  "There is thus no case or controversy, and a suit becomes moot, 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  *Id.* (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013)).  But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Id.* (quoting *Knox v. SEIU*, 132 S. Ct. 2277, 2287 (2012).)

Here, Defendants argue this case is moot because the Does already complied with MIFPA's notice provision and the Mille Lacs Band fulfilled its promise to not intervene in Baby Doe's adoption proceeding.  But the Supreme Court has explained that a case is not moot if it is "capable of repetition, yet evading review," as the Does' case is.  *Davis v. FEC*, 554 U.S. 724, 735 (2008) (quoting *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)).  The capable-of-repetition "exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'"  *Id.* (quoting *Wisc. Right to Life*, 551 U.S. at 462).

On the first element, the Does had far less time than the plaintiffs in various Supreme Court precedents where the Court applied the capable-of-repetition exception.

*Compare* Compl. ¶¶ 2, 41 (one month and five days), *with Turner v. Rogers*, 131 S. Ct. 2507, 2514-15 (2011) (finding a 12-month prison sentence too short), *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978) (18-month referendum authorization period), *Roe v. Wade*, 410 U.S. 113, 125 (1973) (9-month pregnancy), *and S. Pac. Term. Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 514-15 (1911) (two-year administrative order).

On the second element, it is perfectly reasonable to expect that the Does may bear more children in the future because the Does have borne children in the past.  *See Davis*, 554 U.S. at 735-36 (holding it reasonable that Davis might run for election again at a later date); *Roe*, 410 U.S. at 125 ("Pregnancy provides a classic justification for a conclusion of nonmootness.").

The Court therefore finds the Does' case is not moot.[8]

## III.   THE MERITS

Defendants argue that even if the Court may reach the merits, the Does have failed to state a claim upon which relief can be granted.  The Court, however, will not decide this question today.   The motions now before the Court involved a panoply of jurisdictional and preliminary issues, and much of the parties' briefs were necessarily devoted to those matters.  The parties' prioritization is understandable, but as a result an

---

[8] The Does also argue their claims were not moot because Moose's promise and decision not to intervene constituted "voluntary cessation," which is another exception to the mootness doctrine.  *See Young v. Hayes*, 218 F.3d 850, 852 (8th Cir. 2000).  Because the Does' claims are not moot under the exception for cases capable of repetition yet evading review, the Court finds it unnecessary to address this argument.

insufficient amount of detail was devoted to the merits of the Does' claims. Piper and Swanson's opening brief, for example, devoted only eight sentences to the equal protection claim, and only seven to the due process claim. (State Defs.' Mem. in Supp. of Mot. to Dismiss at 9-12, June 25, 2015, Docket No. 32.)

The Court compliments the parties on their thorough and to-the-point briefs, but the Does' novel constitutional claims deserve the parties' and the Court's full attention. The Court will therefore deny remaining-defendants Piper and Swanson's motion as to the merits while inviting the parties' to file a motion for judgment on the pleadings or a motion for summary judgment, if they find such a motion appropriate. *See Beshir v. Holder*, 840 F. Supp. 2d 379, 383-84 (D.D.C. 2012) (declining to decide the merits of a summary judgment motion because of insufficient briefing, but inviting a second renewed motion for summary judgment); *see also Ry. Labor Execs.' Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984) (declining to decide an issue on the basis of insufficient briefing).

The Does' constitutional claims will be resolved another day.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Moose's Motion to Dismiss [Docket No. 24] is **GRANTED**. Counts I, II, III, and IV are **DISMISSED with prejudice** as to Moose. Moose is **DISMISSED** from the case.

    2.       Piper and Swanson's Motion to Dismiss [Docket No. 30] is **DENIED**.


DATED:  February 25, 2016                s/ John R. Tunheim
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                         Chief Judge
                           United States District Court